JAMES D. WALKER AND HENRY HEWETT, RESPONDENTS, *v.* B. GOLDSMITH AND WIFE AND JOSEPH TEAL AND WIFE, APPELLANTS.

SURETY—EXTENSION OF TIME TO PRINCIPAL. — G. borrowed one hundred thousand dollars of W., for which he gave his note. T. entered into an agreement by which he became surety for G. to the extent of his interest in certain lands owned by himself and G., which lands they conveyed in trust to H. to pay G.'s note, in case of default. At the maturity of the note a further agreement, signed by the three parties and by H. was made for an extension of time on the note for two years. In the last agreement it was stipulated that if there was default in the monthly payment of interest the entire debt should thereupon become due, and the land held in trust should be sold to pay the note. G. made default in the monthly payment of interest in January of what T. had no notice until in May: *Held*, that the neglect to sell the property held in trust upon such default, as provided in the last agreement, discharged the property of T. from all liability as security for G.'s debt.

MORTGAGED PREMISES—LIABILITY OF PURCHASER.—When a mortgagor sells the mortgaged premises, subject to the lien of the mortgage, the purchaser does not become personally liable to pay the debt of the mortgagee unless he assumed the payment thereof at the time of the purchase.

FORBEARANCE WILL DISCHARGE SURETY.—Forbearance or neglect by a creditor to sell property pledged as security for the payment of a debt will discharge the surety from liability when the contract requires diligence and promptitude in the sale of the property so pledged.

APPEAL from Marion County. The facts are stated in the opinion of the court.

*Hill, Durham & Thompson and W. H. Effinger*, for appellant:

By the contract of August 19, 1874, Teal agreed that his property so mortgaged should be liable for the debt—with certain restrictions and qualifications hereafter to be more particularly noticed—but it was not his debt, nor the debt

11

of his property.  It was the debt of Goldsmith, and Teal's property stood in equity chargeable, not as the principal fund, but as a secondary fund chargeable with a debt for which Teal had received no consideration, and for which Goldsmith's mortgaged property and Goldsmith himself were chargeable primarily and as principal.  This liability of Teal's property, in the nature of a suretyship for Goldsmith's debt, gave Teal all the rights of a surety with respect to the enforcement of the contract or the discharge of the property from liability. (*Gahn* v. *Niemciewics*, 11 Wend. 312; *Vertie* v. *Underwood*, 18 Barb. 561; *Van Horn* v. *Everson*, 13 Id. 526; *Bank of Albion* v. *Burns*, 46 N. Y. 170.)

And having the right of a surety, with respect to his property so mortgaged, he had the right to have his property discharged from liability unless the terms of the contract were strictly followed.  Whatever method was agreed upon by the contract for enforcing collection; whatever obligations the other parties took upon themselves by the contract, with respect to the subjecting of his property to this debt, they were bound to pursue in all substantial respect; that is, they were bound to perform all the duties they owed him, or his property was discharged. (*Miller* v. *Stewart*, 9 Wheat. 681; *United States* v. *Cheeseman*, 3 Saw. 424; *Supervisors* v. *Otis*, 62 N. Y. 88.)

The time of performance by Teal could not be changed. "If an obligee does an act to change the time of performance by a surety, without his consent, he will be discharged." (*Rathbone et al.* v. *Warren*, 10 Johns. 586; *Ludlow* v. *Simond*, 2 American Decisions, 291, 2 Caines' Cases, 1.)

And this leads to the next question: What were the duties and obligations of plaintiffs, Walker and Hewett, toward defendant Teal under the contracts?  The words duty and obligation are used in the books and the courts as exactly synonymous, so far as concerns the question of the discharge of a surety by departure of the principal creditor from the terms of the contract; that is, whatever duty the creditor owes, by the express or legal implication of the

contract, to one standing in the relation of surety, whether as indorser, guarantor, or any other of the various relations embraced under the generic term surety, he is under obligation to perform on pain of discharging the surety, or the property which gives rise to *quasi* suretyship, as in this case, from all liability. Such is the obvious import of the decisions above cited.

By the terms of the contract of August 19, 1874, it was expressly stipulated that in case the debt should be thirty days over due, Hewett, the agent and trustee of Walker, should proceed, "may and shall proceed," to advertise and sell the mortgaged property in a manner provided by the contract, which sale should be on thirty days' notice. And when did this debt fall due ? By the contract of August 19, 1874, it was to be due absolutely and at all events two years from that date, and it might, at the option of Walker, be due and demandable at any time on twenty days' default by Goldsmith in the payment of the interest, which was to be payable monthly.

By the contract of October 18, 1876, the time when the debt was to fall due at all events was extended for a period of one year from that date, in case the interest should be paid monthly and every month, but making the whole debt absolutely due upon failure of Goldsmith to pay the interest promptly at the end of the month. By this contract it was no longer left with Walker, or Hewett, to consider the debt due or not due, upon failure to pay the interest punctually. That option given by the previous contract was taken away by the later one, and a single default in payment of a month's interest, rendered the entire debt due at once. That was no longer at the option of any of the parties. It was fixed by the contract. And by the same contract it was provided, as we have stated before, that the provisions of the previous contract were not abrogated, except so far as the two were in conflict. There can be no pretense then that the provisions of the first contract, requiring the enforcement of the debt against the mortgaged property immediately after the debt was "thirty days over-due," was annulled by the subsequent contract. On this

point there is nothing that can be construed even into a conflict.

But it is admitted that there was default of payment of the interest due in December or January, 1877, thus making the whole debt due, and that nothing was done toward carrying out the provisions of the contract with respect to enforcing collection against the mortgaged premises, at the end of thirty days or at any time afterwards. The commencement of this suit was the first step of any kind taken by the creditor or his agent, and that was many months after the whole debt was due. The mere forbearance by the creditor does not discharge the surety. But that rule applies only where the surety has not contracted for diligence. In this case, Teal specially contracted for diligence, as shown above, and went so far as to require a particular method to be pursued, and that, too, a summary method which would bring the matter to a crisis and enable him to know the extent of his loss, and indemnify himself much more speedily and surely than by waiting for a judicial foreclosure; and this part of the contract, this stipulation for diligence, being entirely disregarded, the property of Teal is certainly discharged on equitable principles, and we think as certainly upon authority. (3 Leading Cases in Eq. 542; *Bank of Ireland* v. *Beresford*, 6 Dow. 233; *Holl* v. *Hadley*, 2 A. & E. 758.)

Where the surety of a contractor binds himself upon the condition that the owner of the property shall pay to the contractor seventy-five per cent. of cost of construction as the work progresses, and the remaining twenty-five per cent. upon completion; if the owner pays more during construction than the seventy-five per cent., it discharges the surety. (*Bragg* v. *Shain et al.*, 49 Cal. 131.) Sureties on a bond for constructing a canal twenty feet in depth, are discharged if a canal eighteen feet is accepted, because any change in the terms of the undertaking of a surety releases him from liability. (*United States* v. *Corwine et al.*, 1 Baird, 339.)

Where the contract of suretyship provided that a mortgage from the principal should be given, and it was given,

but not recorded, by neglect of the principal, the surety was held discharged, though recording the mortgage would have been of no avail by reason of prior liens. (*Atlanta National Bank* v. *Douglass*, 51 Ga. 205.)

Where a surety bound himself to pay money to be found by the district court, and that court, after trial, settled the principles of the case, but referred it to a master to be appointed by the common pleas, to state the account upon the principles decided by the district court. *Held*, that the surety was discharged, because of the departure from the terms of his contract. (*Smith* v. *Heusman*, 30 Ohio St. 662.)

Where any alteration has been agreed upon and executed the surety is held discharged. (The recent English case of *Holme* v. *Branskill*, 38 L. J. Repts. N. S. 103.) When the creditor and principal substitute some other agreement for the one originally agreed upon, the surety is discharged. (*Mayhew* v. *Boyd*, 5 Maryland, 102; *Gass* v. *Stinson*, 2 Sumner, 453; *Bingham* v. *Wentworth*, 11 Cushing, 123; *Bangs & Alcott* v. *Strong*, 7 Hill, 250.)

The surety can not be bound beyond the letter of his contract. (*United States* v. *Cheesman*, 3 Sawyer, 424.) Hewett represented Walker, whose interests were adverse to Teal's. Teal reserved no power over the property or the proceedings, while Walker, being the creditor for whose sole benefit the property was placed in Hewett's hands, could direct the proceedings—could speed them or delay them, could discharge the debt, extend the time, readjust the entire business; in short, could do with the whole matter as he might choose, within the limits of the contract, with no responsibility to any one but himself for consequences. This grew out of the very nature of the transaction. But it may be asked, were the duties of Walker's agent, Hewett, with respect to diligence and to the method of procedure, so specified in the contract, were those duties such as Teal may insist upon as a condition of his property being charged? Had he been a personal surety for the entire debt there might be some room for saying that these stipulations imposed no duty upon him, for he might go

forward at once and pay up the debt, and by proceeding immediately against Goldsmith, the principal debtor, protect himself as perfectly as he could be protected by diligence on the part of the creditor. That is the principle on which is founded the rule that, in the absence of a contract for diligence, the surety is not discharged by mere neglect of the creditor to sue. But Teal was not a surety for the entire debt. Neither had he undertaken for any definite part of it. How much he was to be damaged by his property being subjected to payment, could only be ascertained by a sale. Till it should be so ascertained, it was an undetermined, undeterminable sum. He could not be required to pay the entire debt, in order to protect himself, for that would be to require him to assume obligations far beyond those he had contracted, which is not required of surety in any case. (*Smith* v. *United States,* 2 Wall. 235.) A *pro tanto* assignment, by way of substitution or subrogation, is not known or allowed. (*Gannett* v. *Blodgett,* 39 N. H. 150.) Neither could he tender a certain sum in discharge of his obligation, for the extent of his obligation could not be ascertained. Neither could he proceed to ascertain the amount of his obligation by putting his property to sale, for he had parted with the legal title by the trust deed to Hewett, and could give no title to the purchaser.

And even had he paid such a portion of the debt as would have satisfied Walker and procured the discharge of his property, the amount for which he would have been subrogated, would still have been open to legal controversy, whenever he might seek indemnity or reimbursement from Goldsmith. An agreement for extension, indorsed on the note, for a specified time after maturity, if executed, discharges the surety. (*Chute* v. *Potter,* 37 Me. 102.)

In the case of *Huff* v. *Cole et al.,* 45 Ind. 300, the principal debtor indorsed on the note: "I hereby agree to pay ten per cent. on this note hereafter, July 29, 1868, M. E. Cole." The creditor forebore collection, which discharged the surety.

*Catlin, Killin & Nicholas and E. D. Shattuck*, for respondents.

The appellant Teal claims exoneration from liability on account of an alleged agreement between Walker and Goldsmith to give the latter time. The respondents insist that there was no valid or binding agreement at all to extend the time; that the most that can be found from the testimony is a conditional promise, without consideration or legal obligation, to make a new agreement at some future day, which conditional promise never had any effect or operation, and resulted in no new agreement whatever; that there was never at any time any act, agreement or omission on their part that in the least interfered with the use by Teal of all or any of the remedies known to the law for his protection; that there was no act of theirs or of either of them, between December and August, that could have created any bar or abatement to any proceedings on their part to collect the debt. Simple passiveness and fruitless negotiations were all.

The allegations of negligence in not recording one of the deeds from Goldsmith and misappropriation of some of the land are not proven, and if they were the facts alleged, if of any effect, could only operate to reduce the liability of Teal *pro tanto*. (3 Leading cases in Eq. 553; citing 7 Leigh, 135; 6 Smedes, A. M. 24; 2 Harris, 297; 37 N. Y. 606.) There is a sufficient consideration expressed in the agreement of 1876 for Teal's promise to pay the debt as well as for the conveyance of the additional lands. Walker had a valid claim and lien on all of Teal's lands conveyed in 1874, and a perfect right to proceed immediately to subject them to the payment of his demand. Teal promised and undertook, along with Goldsmith, that if Walker would wait one year longer the debt should be paid.

"An agreement" like this, "to forbear for a time to proceed at law or in equity to enforce a well-founded claim is a valid consideration for a promise." (1 Parsons Con. 444; Burge on Suretyship, 11.) Like an indorser for value, Teal became as to Walker a principal debtor. (2 N. Y. 352.)

"If a promise to pay the debt of another be founded on a new and distinct consideration, independent of the debt and one moving between the parties to the new promise, it is not a case within the statute, and the point is too clearly settled to be questioned." (Kent, C. J., in *Leonard* v. *Underburgh*, 8 Johns. 36; 2 Parsons Con. 10.) We insist, then, that Teal being a promisor for value moving to himself, none of his defenses, even if they were founded in fact, which they are not, could avail him. He made the contract of 1876 as a principal, and he should be treated as a principal in the matter of extension. (2 N. Y. 352; 3 Leading cases in Eq. 569; 6 Cowen, 484.) But if it be held that Teal, by the contract of 1876 and the acceptance of the deeds in April, 1877, with the recitals therein, did not become bound to pay Walker's demand except as a surety, and only to the extent of the land conveyed, he is still bound that far. Nothing has occurred which exonerates his property from liability.

As a surety he had a right at all times to be able to pay the debt and immediately have his remedy over against Goldsmith, and as long as this right is preserved the surety is held. (Burge, 208.) The surety may also in equity, as soon as the debt becomes due and payable, file a bill to compel payment of the debt by the principal, in order to relieve himself or his property from liability. (1 Leading Cases in Eq. 143; 1 Story's Eq. Jur., sec. 327.) So long as the creditor puts no obstacle in the way of the surety enforcing these remedies, either before or after payment, he is held. (*Creath's Adm.* v. *Sims*, 5 How. 192, or 16 Curtis, 353.)

"Mere passiveness by the creditor in not taking proceedings against the debtor will not, in the absence of a stipulation in the instrument of suretyship rendering activity on his part necessary, release the surety." (3 Leading Cases in Eq. 542; *Creath's Adm.* v. *Sims*, 5 How. 192; *King* v. *Baldwin*, 2 Johns. Ch. 554; Story Eq. Jur., sec. 327.)

It is ever held that "the surety can not resist a suit on the contract, either at law or in equity, on the ground that the creditor has omitted to take measures against the prin-

cipal, after request to do so, and that in consequence all opportunity of collecting the debt from the principal has been lost." (*King* v. *Baldwin,* 2 Johns. Ch. 554.) And this is the rule in a majority of the states of the union. (3 Leading Cases in Eq. 550.) But there is no allegation or proof in this case that Teal ever requested Walker to proceed and collect his money.

If Teal can be released at all, then it must be by some absolute and valid agreement by Walker with Goldsmith to extend the time of payment, or some conditional agreement, of which the conditions were complied with, and to which Walker became bound so as to lose or have suspended his right to proceed against Goldsmith.

Because an "agreement to wait, without consideration, does not discharge the drawer of a bill, because the acceptor may, notwithstanding such agreement, be sued at any time." (2 Parsons Con. 26; *Reynolds* v. *Wood,* 5 Wend. 505; 11 Id. 312; 3 Paige, 629.)

"An agreement with the principal to extend the time of payment, which will have the effect to discharge his sureties, must be an agreement which the principal can enforce as a binding agreement between him and the creditor, and must be founded upon a sufficient consideration. When the creditor agrees to give time of payment to the principal debtor, in consideration that he will pay a part of the debt, when the whole of the debt is payable immediately, or that he will pay interest on the debt, such agreement is founded on an insufficient consideration and will not discharge the surety." (*Vilas* v. *Jones,* 1 Com. 286; 19 Wend. 387; 12 Wheaton, 554; 3 Leading Cases in Eq. 564; *McCann* v. *McDermott,* 13 N. H. 528.)

Teal's acceptance of the deeds of April, 1877, conveying Goldsmith's land to him, subject " to the indebtedness by said note evidenced," is equivalent, as we contend, to a stipulation that the deeds were made "subject to the payment" of the debt referred to, which implies a personal obligation for its payment. (1 Jones' Mort. 749; *Halsey* v. *Reed,* 9 Paige, 446; 29 Barb. 524; 1 Hilliard's Mortgages, 232 (ed. of 1853); 1 Sugden on Vendors, 226 (ed. of 1845.)

The note and contract of 1874 recognize fully Walker's option to declare the whole debt due for twenty days default in payment of interest. It is provided that "if there be default in the payment of interest for the period of twenty days, then the whole sum, principal and interest, shall, at the option of the holder of this note, be immediately due and payable." This option continued after the agreement of 1876, unless it was taken away by that agreement. But Teal and Goldsmith, in the contract of 1876, expressly stipulated that "in default of the payment of said principal sum or interest, as hereinabove specified, the whole of said principal sum and the then accrued interest shall become due and payable as provided in said agreement of August 19, 1874;" and Walker in the same agreement of 1876 expressly reserved his option by providing that "if default shall be made in the monthly payments of interest * * * then the whole of said principal sum with interest thereon accrued * * * shall become due and payable in gold coin of the United States as in said note specified."

The last clause of the contract of 1876 also clearly indicates that Walker's option continued through the whole year of the extension, else why was it provided "that if the interest shall be promptly paid, etc., without default, for a period of one year from the date hereof, so that the interest shall at that time all be paid," then there should be an extension for another year? But if Walker had no option, the case is simply one of a debt due twenty-first of January, 1877, and a forbearance to proceed to collect or sue till July, and upon the authorities cited Teal was not discharged nor his property exonerated. The promise, if any, to wait till May before collecting interest due, was wholly without consideration, and being so could have been no bar or obstruction to proceedings to collect the very day it was made. (5 Wall. 500, 507; 12 Wheat. 554.) The agreement to pay the interest in May was no consideration for the alleged agreement to wait until May. (*Van Allen* v. *Jones*, 10 Bosworth, 369.)

The alleged agreement of twenty-seven and twenty-eighth

March (if any) to renew and modify the terms of the loan
in May was also without consideration, and was conditional
upon Goldsmith's paying up the interest and the making
of new papers, notes and mortgages—conditions that were
never performed nor offered to be performed. Such a state
of facts can not discharge Teal. (Brandt, sec. 323; 24 Vt.
293.) A promise by a debtor to keep the money is no
consideration for a promise to extend time. (*Kellogg* v.
*Olmstead*, 25 N. Y. 189.) In this case Hewett was trustee
for both parties — as much Teal's agent and trustee as
Walker's—and there could be no exoneration of Teal's
property, by reason of Hewett's failure to take possession
and sell, unless Teal and Goldsmith had tendered posses-
sion and demanded that he proceed and satisfy the debt,
and Walker prevented his doing so, which was not the fact
in this case, but the very contrary.

By the Court, KELLY, C. J.:

On the nineteenth day of August, 1874, the appellant, B.
Goldsmith, borrowed of the respondent one hundred thou-
sand dollars, and gave his promissory note therefor, a copy
of which is set out in the agreement of the parties herein-
after set forth. To secure the payment of this note, the
appellants, Goldsmith and Teal, and their wives, executed
certain deeds to the respondent, Henry Hewett, conveying
a large amount of land to him, which deeds were absolute
upon their face, but were, in fact, trust deeds, and the con-
dition and terms of the trust were defined by a certain in-
strument of writing, executed at the same time, which is as
follows:

   "Whereas, B. Goldsmith, of the city of Portland, Ore-
gon, has borrowed of James D. Walker, of the city of San
Francisco, California, the sum of one hundred thousand
dollars, for which he has executed his promissory note; and
the same with this instrument and with the deeds hereinafter
mentioned, are to be delivered contemporaneously, and
take effect at the same time, of which promissory note a
copy is in letters and figures following, to wit:

"$100,000.          PORTLAND, Oregon, August 19, 1874.

"Two years after date, without grace, for value received, I promise to pay to James D. Walker, or order, one hundred thousand dollars, with interest thereon at the rate of one per cent. per month, from date, till paid. Interest to be paid monthly. Principal and interest to be paid in gold coin of the United States, and not otherwise, at the office of Falkner, Bell & Co., in the city and county of San Francisco, California. And if there be default in the payment of interest for the period of twenty days, then the whole sum, principal and interest, shall, at the option of the holder of this note, be immediately due and payable; *provided,* that at any time after one year from date before maturity of this note, the same or any installment not less than twenty thousand dollars, exclusive of interest, may, at my option, be paid on thirty days' notice to the holder.

(Signed)                    "B. GOLDSMITH.

"And, whereas, Joseph Teal, of the city of Portland, Oregon, in consideration of said loan and the advance of the said one hundred thousand dollars by said Walker to said Goldsmith, has agreed to become surety for said Goldsmith to the extent of his, said Teal's, interest and estate in the lands hereinafter mentioned, and not otherwise; and at the request of said Goldsmith, the security for the payment of said money is taken by said Walker in the form of trust deeds, or deeds with a separate declaration of trust by way of mortgage instead of mortgages proper, and said B. Goldsmith and Emma, his wife, and Joseph Teal and Mary E. Teal, his wife, as parties of the first part, have executed to Henry Hewett, of the city of Portland, Oregon, as party of the second part, absolute warranty deeds upon their face, as follows:"

[Here follows an enumeration of the deeds executed, and descriptions of the land conveyed by such deeds.]

"Now, these presents made by Henry Hewett, aforesaid, party of the first part, said B. Goldsmith and Joseph Teal, party of the second part, and said James D. Walker, party of the third part, witness: That said parties, in considera-

tion of the premises, mutually agree and declare each to and with each as follows, to wit:

"1. Said Hewett holds the legal title to all the lands in the above-mentioned deeds described, in trust, and to the uses herein declared.

"2. Subject to the legal title in said Hewett, as aforesaid, said Teal and Goldsmith, or Goldsmith alone, shall retain and have possession of and control over all the said lands; and enjoy and have, without account, the issues, rents, and profits thereof, until such time as the promissory note above-described shall become due, and being overdue shall remain thirty days unpaid, and upon such default in payment being made, said Goldsmith and Teal, and Goldsmith will and shall on demand, peaceably surrender to said Hewett or his representatives or successors in said trust, the possession of all said lands, and every parcel thereof, to be by him disposed of as herein provided, it being understood and agreed that until and up to the time that said default in payment of said note shall happen, and possession of said land delivered to said Hewitt or his successor in trust, the said Goldsmith and Teal, and Goldsmith will and shall pay all taxes of every sort and name, and all assessments and public charges levied on or becoming a lien on said land, and that if they fail to so pay in due time such taxes, charges and assessments, the said trustee may pay the same, and whatever sum he may so pay shall be added to the principal debt against B. Goldsmith, and be repaid with interest at one per cent. per month, from date of payment out of said lands, and be deemed as lien thereon.

"3. If the above-recited promissory note, and the interest thereon, and all the taxes, charges and assessments on said land be duly paid by said Goldsmith or for him, then the deeds aforesaid shall be deemed void, and said Hewett or his representatives or successors in trust shall reconvey all said lands and every parcel thereof to said Teal and Goldsmith, or said Goldsmith, or their representatives entitled thereto. But if the said Goldsmith shall fail to pay the above described promissory note or the interest thereon,

and default be made, so that according to the tenor of said note the same shall be thirty days overdue, then said Henry Hewett or his successor in trust may and shall proceed and take possession of said lands, and on thirty days' notice in writing to said Teal and Goldsmith and Goldsmith or said B. Goldsmith, requiring them to pay said debt (including also any delinquent taxes or any taxes paid by said trustee as hereinbefore provided), and on their failure so to pay, shall sell the same at public auction, on not more than thirty days' public notice, either in parcels or in a body (that is to say, the Linn county lands in a body and the Polk county and Benton county lands in a body or in parcels), at the option of said trustee, and such sale shall be (if made) for cash, and the party of the third part may at his option, being the highest bidder, become and be the purchaser, taking and applying the land purchased upon and in satisfaction in full or *pro tanto* of the debt aforesaid; and said parties of the second part covenant and agree that if upon such sale any other or further deed, release or conveyance by them or either of them may be necessary to convey their interest to the purchaser, or shall be demanded by such purchaser to quiet his title, they and their heirs or representatives will and shall make, execute and deliver the said deed, release or conveyance, at their own cost and charge. It is expressly understood, however, that when sufficient lands have been sold to pay said debt and charges, the residue of said lands remaining in the name of said trustee are to be reconveyed over to said Teal and Goldsmith or Goldsmith alone, as the right may be. And upon sale of said lands or any portion of them the said trustee is to dispose of the proceeds of sale in manner following, to wit:  *  *  * It is agreed that if at the expiration of one year from date hereof, or at any time thereafter before the maturity of said note, said Goldsmith and Teal shall desire to dispose of any portion of said lands so as to make a payment on said principal sum in said promissory note named, to an amount not less than twenty thousand dollars, the trustee, said Henry Hewett, or his successor in trust, shall so dispose of the

same and sell it at prices not under the fair and reasonable value thereof, at private sale, to wit:   \*   \*   \*"

This agreement was entered into August 19, 1874, and was signed by Walker, Hewett, Goldsmith and Teal.

On the eighteenth day of October, 1876, only a small portion of the debt having been paid, other lands were conveyed by Goldsmith and Teal and their wives to Hewett as additional security for the debt, and a second agreement was made between the parties, reciting the existing agreement and the failure of Goldsmith to comply therewith, and that Goldsmith desired an extension of time for one year, with the privilege of paying the interest at the rate of one twelfth of ten per cent. per annum, monthly, and the remaining two twelfths at the expiration of the year; and the fact that Goldsmith and Teal, as further and additional security, had by deeds absolute conveyed to Hewett other lands described to be held, as the lands already conveyed were held, under the agreement of August 19, 1874, and for the further purposes in the new agreement thereafter named. It was provided in this new agreement that Goldsmith should pay the interest monthly, and the principal at the end of the year as above recited. It was further provided as follows:

"The parties of the second part, in consideration of the extension of the time of the payment of said note for a period of one year from the date hereof, undertake and agree that said Goldsmith will promptly pay one twelfth of ten per cent. per annum of the interest upon the unpaid principal of said promissory note, each and every month, and at the end of the year he will pay the whole of said principal, and the remaining two twelfths of the interest specified in said note upon said principal sum of ninety-six thousand seven hundred and fifty dollars, and in default of the payment of said principal sum or interest, as herein above specified, the whole of said principal sum, and the then accrued interest, shall become due and payable as provided in said agreement of August 19, 1874. And, further, if suit shall be instituted for the collection of said money or any portion thereof, that he, Goldsmith, will pay

such attorney fee for instituting such 'suit and collecting
such money, as the court may adjudge reasonable as
attorney's fees in such suit, which sum may be added to
the said principal sum, and judgment or decree may be
taken therefor, and it shall become a part of said principal
debt payable in gold coin of the United States, and secured
as said principal debt is by said trust deeds, and the prop-
erty therein described, and conveyed to said Henry Hewett.
That nothing herein contained shall be so construed as to
prevent or prohibit said trustee from selling said land to
him conveyed as provided in said agreement of August 19,
1874, upon the default of the payment of said principal sum
and interest, as herein above provided that the same shall
be paid.

"That said party of the third part agrees to extend
the time of the payment of said principal sum of ninety-six
thousand seven hundred and fifty dollars, and two per cent.
thereon, for a period of one year from the date hereof, or
until default shall be made in the monthly payments of the
interest as herein above specified and provided, and no
longer; but if default shall be made in the monthly pay-
ments of interest, as herein above provided, or of any such
payments, then the whole of the said principal sum, with
interest thereon accrued at the time of such default, at the
rate of one per cent. per month shall become due and pay-
able in gold coin of the United States, as in said note spe-
cified, and the said property conveyed to said Hewett in
trust, and mentioned and referred to ·in said agreement of
August 19, 1874, and said property herein above described
or referred to shall be sold for the payment thereof, as by
law and in said agreement provided, and for the payment
of such attorney fee as the court may adjudge reasonable in
case suit shall be instituted.

"It is distinctly understood and agreed by the parties
hereto that said sum of ninety-six thousand seven hundred
and fifty dollars, and the interest to accrue thereon, is and
shall be payable only in gold coin of the United States, and
that none of the security heretofore given or now given by
said Goldsmith and Teal to secure the payment of said

note is surrendered or forfeited. And, further, that the agreement of August 19, 1874, is not annulled, vacated or set aside by the execution of this agreement, excepting in so far as the same may conflict with this agreement; in all other respects the two instruments are to be taken and construed together. It is further understood and agreed that if the interest shall be promptly paid upon the principal now due upon said note, as herein above provided and agreed, that said interest shall be paid, without default for a period of one year from the date hereof, so that the interest shall at that time all be paid, then the term for the payment of said note (the principal thereof) shall be extended upon the same terms and conditions for a period of another year, the security for the payment thereof remaining the same."

The monthly interest due on the note was paid up until the twenty-first of December, 1876, but default was made in the payment of interest on the twenty-first day of January, 1877. Since then no interest has been paid. There is no evidence to show that Teal was ever notified of the failure of Goldsmith to pay the interest due on the note until some time in May, 1877. In January or February, 1877, at San Francisco, negotiations were entered into between Goldsmith and Hewett, as the agent of Walker, for an extension of the time for the payment of the debt, or, rather, for renewing the loan for several years at a lower rate of interest. Nothing, however, was definitely agreed upon at that time, and the matter was left open for further consideration. Goldsmith having returned to Portland, negotiations for an extension of the loan were resumed by telegraph on the twenty-seventh day of March, 1877, when the following correspondence was had:

"PORTLAND, OREGON, March 27, 1877.

"To James D. Walker, Henry Hewett, agent, San Francisco, Cal., care Faulkner, Bell & Co.:

"If you will delay collection of interest on that one hundred thousand dollar loan of mine, until May next, I will pay it up, and will accept your proposed modification of loan. If this is satisfactory, answer immediately.

"B. GOLDSMITH."

"SAN FRANCISCO, March 27, 1877.

"Received at Portland, Oregon, 27, 1877, 3 P. M.

"To B. Goldsmith:

"Walker absent to-day—unless urgent, wait my return next steamer.

"HENRY HEWETT.

"10 collect D. R. V."

"PORTLAND, OREGON, March 28, 1877.

"To H. Hewett, care Faulkner, Bell & Co.:

"It is necessary and of importance to have definite answer within two days.

"B. GOLDSMITH."

"SAN FRANCISCO, 28, 1877.

"Received at Portland March 28, 1877, 1:57 P. M.

"To B. Goldsmith:

"We agree—payment back interest May—then renewing loan installment plan—seven years—ten per cent.—answer if accepted.

"J. D. WALKER.

"19 collect W. V."

Goldsmith answered this last telegram, accepting the offer it contained. Nothing further was done until after the first of May, when Hewett, as the agent of Walker, notified Goldsmith of the expiration of time for payment of interest as follows:

"Portland, May 4, 1877.

"B. Goldsmith, Esq., Portland:

"Dear Sir:—When in San Francisco, we agreed to wait, until May, for the back interest due on your note to J. D. Walker. May is now here and Mr. Walker instructs me to collect at once or foreclose.

"Referring to our conversation of yesterday, I can only repeat that, from present appearances, it would not be wise for me to make any new arrangement regarding the Walker loan; but, when the interest is kept paid up, it is easy to arrange the balance. Yours truly,

"HENRY HEWETT, Agent."

Teal was not a party to these negotiations for extension of time, and was not cognizant thereof. On the seventeenth day of April, 1877, Goldsmith and wife by deed conveyed

to Teal all their interest in the lands which they held in common. This deed contains a recital that Teal took the said lands "subject to the said James D. Walker's lien upon them for the payment of the promissory note aforesaid, and subject to the indebtedness by the said note evidenced."

Thus matters stood, and nothing further was done by the respondents until the twenty-sixth day of September, 1877, when this suit was commenced to foreclose the lien upon the lands conveyed in trust to Hewett by the deeds of Goldsmith and Teal on the nineteenth of August, 1874, and eighteenth of October, 1876.

The complaint, in addition to the usual allegations in a suit to foreclose a mortgage, avers that Teal became personally liable, under the agreement of October 18, 1876, to pay the full amount of Goldsmith's indebtedness. That he also became liable to pay the same by his acceptance of the deed of April 17, 1877, from Goldsmith to him of the lands conveyed in trust to Hewett.

Goldsmith filed a separate answer, raising the question of the reasonableness of the claim for attorneys' fees and charges of the trustees.

Teal and wife file a separate answer, in which they deny that Teal was ever personally bound as surety or otherwise. They aver the failure and neglect of Walker and Hewett to proceed according to the terms of the contracts to sell the trust property, and that Teal was thereby discharged from his liability as surety for Goldsmith. They further aver that in March, 1877, Walker and Hewett entered into an agreement with Goldsmith, without his (Teal's) knowledge or consent, whereby the time for the payment of the said indebtedness, principal and interest, was extended to May, 1877, and that the property of Teal was thereby discharged from all liability for the debt.

The replication denies the averments set forth in the answer. These are all the points in the pleadings to which we think it necessary to refer.

The court below entered a decree in favor of the respondent Walker against Goldsmith for one hundred and eleven

thousand two hundred and twenty-seven dollars and ninety-five cents, and the further sum of two thousand five hundred dollars for attorneys' fees, besides costs. And further decreed that the lands of Goldsmith and Teal described in the trust deeds be sold and the proceeds applied to pay the above sums found to be due from Goldsmith to Walker.

From this decree both parties have appealed to this court.

The first point made by respondents is that under and by virtue of the agreement of October 18, 1876, Teal became personally liable to pay Goldsmith's debt to Walker. In other words, that he then ceased to be a surety and became a principal equally liable with Goldsmith for the whole amount due to Walker. To establish this personal liability of Teal, the respondents rely on the following clause of the second agreement dated October 18, 1876: "The parties of the second part, in consideration of the extension of time of the payment of said note for a period of one year from the date hereof, undertake and agree that said Goldsmith will promptly pay one twelfth of ten per cent. per annum of the interest upon the unpaid principal of said promissory note each and every month, and at the end of the year he will pay the whole of said principal, and the remaining two twelfths of the interest specified in said note upon said principal sum of ninety-six thousand seven hundred and fifty dollars." We do not consider that Teal incurred any personal liability to pay Goldsmith's debt by this clause in the agreement. There is no promise by him to pay anything; and the parties themselves specify in the same sentence, and as a part of it, what should be the consequences of a non-payment by Goldsmith, in these words: "And in default of the payment of the said principal sum, or interest as herein above specified, the whole of said principal sum and the then accrued interest shall become due and payable as provided in said agreement of August 19, 1874."

This clause in the agreement is simply that in consideration of the extension of the time for payment, Goldsmith and Teal promised, not that they, but that Goldsmith would pay the specified interest every month, and the principal at the end of the year; and on the failure of Goldsmith to do

so, the whole debt should become due according to the
terms of the former agreement. This, certainly, did not
create any personal obligation on the part of Teal to pay
anything. If it was his intention to become personally lia-
ble for Goldsmith's debt, doubtless it would have been so
expressed in the agreement.

On the seventeenth day of April, 1877, Goldsmith and
wife conveyed to Teal all their interest in the common lands
which had formerly been conveyed in trust to Hewett. This
deed contained a recital that Teal " took said lands subject
to said James D. Walker's lien upon them, for the payment
of the promissory note aforesaid, and subject to the indebt-
edness by said note evidenced." It is now insisted by re-
spondents that the acceptance of this deed by Teal rendered
him personally liable to pay the debt of Goldsmith. This
proposition we regard as untenable. The rule, as laid down
in the leading authorities, is this: "Where one who has
mortgaged land to secure a debt afterwards sells the equity
of redemption subject to the lien of the mortgage, and the
purchaser assumes the payment of the mortgage as a por-
tion of the purchase-money, the latter becomes personally
liable for the payment of the debt of the former to the
holder of the mortgage in the first instance." (*Halsey* v.
*Reed*, 9 Paige, 446; *Marsh* v. *Pike*, 10 Id. 595; *Russell* v.
*Pistor*, 7 N. Y. 171; *Trotter* v. *Hughes*, 12 Id. 74; *Stebbins*
v. *Hall*, 29 Barbour, 524.)

The supreme court of this state has, in effect, adopted
this rule. (*Miles* v. *Miles*, 6 Or. 268.) The recital in
Goldsmith's deed to Teal does not state that Teal assumed
the payment of Walker's debt, nor is there any evidence in
the case tending to prove that fact. On the contrary, the
testimony of B. Goldsmith shows that the consideration
for that deed was not the payment of Walker's debt, but
the payment of some other notes which Teal had indorsed
for him. We now come to consider the relations of Teal
to the debt upon which this suit is founded, and the nature
and extent of the liability of his property conveyed to
Hewett in trust for the payment of that debt. Teal was
not a maker of the note to Walker, nor was he a guarantor

or personal surety for its payment.   In the words of the contract of August 19, 1874, he "agreed to become surety for said Goldsmith to the extent of his interest and estate in the lands described in the deeds hereinafter mentioned, and not otherwise."

This liability of Teal's property in the nature of suretyship for Goldsmith's debt gave him all the rights of a personal surety with respect to the enforcement of the contract. And any act on the part of Walker or Hewett, or the omission to perform any duty or obligation by them which would discharge Teal if he were a personal surety, will equally discharge his property from liability.   (Brandt on Suretyship, sec. 21; *Vertie* v. *Underwood,* 18 Barb. 561; *Van Horn* v. *Everson,* 13 Id. 526; *Bank of Albion* v. *Burns,* 46 N. Y. 170; 11 Wend. 312.)

Teal claims that Walker and Hewett neglected to sell the trust property conveyed to Hewett, when by the terms of the contract he was required to do so within a specified time, and that such neglect thereby discharged his property from all liability for Goldsmith's debt.   It is well settled, as a general rule, that the mere passive delay of a creditor in proceeding against the principal, however long continued and however injurious it may be to the surety, will not discharge the surety.   But to this rule there are exceptions. If there be a stipulation between the parties that the creditor is on default to sue the debtor without delay, passiveness will discharge the surety.   (*The Bank of Ireland* v. *Beresford,* 6 Dow. 233.)   So where the defendant's testator was a guarantor for the value of coals to be supplied to one N. H. on condition that no application should be made to the surety for payment "but on the failure of the utmost efforts and legal proceedings 'of the plaintiffs to obtain payment from N. H.'"   It was held by the court of king's bench that where the plaintiffs suffered two years to elapse before bringing suit against the principal, that the surety was discharged.

Lord Denman, delivering the opinion of the court, said: "The agreement virtually is (plainly for the surety's protection) that they, the plaintiffs, shall use their utmost efforts

against the principal, before they call upon the surety. * * * And we cannot hesitate to say that the utmost efforts were never made, and consequently that they have not performed the condition imposed upon them, which was made precedent to their right to sue on the guarantee." (*Hall* v. *Hadley,* 2 Adolph & Ellis, 758.) "It is a general rule, that if the condition, known to the creditor, upon which the surety agrees to become bound, is not complied with, the surety is discharged." (Brandt on Suretyship, etc., sec. 350; *Dundas* v. *Sterling,* 4 Pa. St. 73.)

In the agreement of August 19, 1874, it was stipulated, among other things, as follows: "But if the said Goldsmith shall fail to pay the above-described promissory note or the interest thereon, and default be made so that according to the tenor of said note the same shall be thirty days overdue, then said Henry Hewett, or his successor in trust, may and shall proceed and take possession of said lands, and on thirty days notice in writing to said Teal and Goldsmith and Goldsmith or said B. Goldsmith, requiring them to pay said debt, including also any delinquent taxes or any taxes paid by said trustee as herein before provided, and on their failure so to pay, shall sell the same at public auction on not more than thirty days public notice, either in parcels or in a body."

By the terms of the note, in the event that Goldsmith should make default in the payment of the interest for twenty days, it became optional with Walker to have the whole amount of the note become due and payable. But after it became payable by the lapse of two years, that option was gone. As it became due on the nineteenth day of August, 1876, Hewett was required, by the terms of the contract, to take possession of the lands on the eighteenth day of September following, and to give Goldsmith and Teal notice to pay the debt on or before the eighteenth day of October, 1876, and in case of failure to proceed and sell the lands within thirty days following.

On that day, the eighteenth day of October, 1876, the parties entered into the new contract, whereby the time for the payment of the debt was extended for one year from that

date, in case the interest should be paid every month, but making the whole debt absolutely due upon the failure of Goldsmith to pay the interest promptly at the end of each month.

By this contract, it was no longer optional with Walker to consider the debt due or not due upon the failure to pay the interest punctually. That option given by the first contract was taken away by the second, and a default in the payment of a month's interest, rendered the entire debt due at once. It became due by the terms of the contract, and independent of the will of the parties. And in that case, the second contract exacted promptitude in the sale of the lands by Hewett, in accordance with the terms and provisions of the contract of August 19, 1874, as follows: " But· if default shall be made in the monthly payments of interest, as herein above provided, or of any such payments, then the whole of the said principal sum, with interest thereon accrued at the time of such default at the rate of one per cent. per month, shall become due and payable in gold coin of the United States, as in said note specified, and the said property conveyed to said Hewett in trust, and mentioned and referred to in said agreement of August 19, 1874, and of said property herein above described or referred to, shall be sold for the payment thereof, as by law and in said agreement provided."

Goldsmith made default in the payment of interest, on the twenty-first day of January, 1877, and on that day the whole debt became due and payable. By the terms of the agreements, Hewett was required to take possession of all the lands when the debt was thirty days overdue, that is on the twentieth day of February, 1877, and in case of a failure of Goldsmith and Teal to pay the debt after thirty days notice to them, the contract enjoined upon him the duty of selling all the lands at public auction, on not more than thirty days notice, after the failure of Goldsmith and Teal to comply with the requirements of the notice. In other words, Mr. Hewett, the trustee, was required to sell all the trust lands within ninety days after the twenty-first day of January, 1877. This is not like a case of mere forbearance to enforce

the payment of a debt, for which a surety is liable.  Here the terms of the contract prohibit forbearance and require promptitude in the collection of the debt.  In this case Teal specially contracted for diligence in the sale of the trust property.  This was one of the conditions upon which he pledged his lands as security for Goldsmith's debt.

It is urged by the counsel for respondents that when default was made by Goldsmith in the payment of interest, Teal had the privilege of paying the debt and taking an assignment of the note from Walker, and that it was his duty to do so, if he desired no forbearance should be extended to Goldsmith in the sale of his property.  That undoubtedly would be so in ordinary cases of suretyship, where the surety is under obligation to pay the whole demand in default of payment by his principal.  But that is not so in this case.  Teal did not agree to become surety for the payment of the whole debt, and to impose this burden upon him would be unjust.  And yet he could not obtain possession or control of the note without payment of the full amount to Walker.  Teal had, moreover, placed his own property beyond his control by conveying it to Hewett specially to pay this demand, and he had no power to dispose of it even to pay the debt for which it was pledged.  This could be done by Hewett, and by him alone, and only in the manner specified in the agreement of the parties.

It is urged by the counsel for respondents, that Hewett, as trustee, was as much the agent of Teal as he was of Walker, and that his neglect to sell the property was as much chargeable to the one as to the other.  We do not so regard it.  Hewett directly represented Walker, whose interests were adverse to those of Teal.  Teal had already parted with his title to the property, and could no longer control it or direct how or when it should be sold by the trustee.  If, instead, the lands had been mortgaged directly to Walker, with power to sell the same at public auction in case of default in the payment of the debt, it could hardly be contended that the mortgagee would be the agent of the mortgagor in making the sale.  We think that the neglect to sell the property conveyed to the trustee within the time prescribed

in the agreements of the parties discharged the property of Teal from all liability as security for the debt of Goldsmith to Walker; and that the trustee, Henry Hewett, should reconvey to Joseph Teal all the lands conveyed to him by Teal and wife on the nineteenth day of August, 1874, and the eighteenth day of October, 1876.

Taking this view of the case, it becomes unnecessary for us to decide what was the effect of the contract made by telegraph on the twenty-eighth of March, 1877, between Walker and Goldsmith as to the extension of time for the payment of the debt.

The decree of the court below is affirmed, so far as it relates to the appellant, B. Goldsmith, and revoked so far as it directs a sale of the lands conveyed by Joseph Teal and wife to Henry Hewett on August 19, 1874, and October 18, 1876. And the said Henry Hewett is hereby directed to reconvey the said lands to said Joseph Teal within three months from the date of this decree, upon the payment by said Teal of the reasonable fees for making such reconveyance.